IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                              PLAINTIFF/RESPONDENT

VS.                              Civil No. 5:14-cv-05188-TLB-MEF
                                 Criminal No. 5:11-cr-50101-TLB-MEF

RYAN CORNELISON                                       DEFENDANT/PETITIONER

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is the Petitioner's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or

Correct Sentence by a Person in Federal Custody (Doc. 38) filed on June 20, 2014, and his Amended

Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal

Custody (Doc. 47) filed on September 18, 2014. The Government filed its Response to Petitioner's

original § 2255 Motion on July 24, 2014 (Doc. 41), and it filed its Response to Petitioner's Amended

§ 2255 Motion on October 24, 2014 (Doc. 54). Petitioner thereafter filed the Declaration of Joseph

Cornelison on October 28, 2014 (Doc. 55), and Petitioner's Reply to the Government's Response

was filed on November 17, 2014 (Doc. 58).

### I. Background

On November 2, 2011, Petitioner, Ryan Cornelison ("Mr. Cornelison"), was named in a one-

count Indictment filed in the United States District Court for the Western District, Fayetteville

Division. (Doc. 1) The Indictment charged that Mr. Cornelison, having been previously convicted

of a crime punishable by imprisonment exceeding one year, knowingly possessed one or more

firearms, which had been shipped and transported in interstate commerce, in violation of 18 U.S.C.

§§ 922(g)(1) and 924(a)(2). Mr. Cornelison was arraigned on February 15, 2012, at which time he

1

entered a plea of not guilty to the charge, and Jack Schisler, AFPD ("Mr. Schisler"), was appointed to represent Mr. Cornelison. (Doc. 5, 7)

On March 26, 2012, the Government filed its Brief in Support of Admission of Other Acts Evidence Pursuant to FRE Rule 404(b). (Doc. 11) Specifically, the Government sought to introduce a Judgment and Commitment Order dated June 29, 2010 from the Circuit Court of Washington County, Arkansas, for the charge of possession of a firearm by certain persons in violation of A.C.A. § 5-73-103, to show Mr. Cornelison's intent and knowledge, as well as the absence of mistake or accident, to possess the firearms. Mr. Cornelison filed his Response in opposition to the Government's notice of intent regarding Rule 404(b) evidence on March 26, 2012. (Doc. 14) Mr. Cornelison argued that the prior conviction had little probative value on the issue of knowledge and intent to possess the firearms, and that any probative value it did have was substantially outweighed by the danger of unfair prejudice.

Jury trial was held on March 27 and 28, 2012, before the Hon. Jimm Larry Hendren, District Judge. (Doc. 16, 19) The Government presented the testimony of Stephen Hulsey ("Det. Hulsey"), a detective with the Washington County Sheriff's Office. (Doc. 33, p. 31) Det. Hulsey testified that during the course of working another criminal investigation, he was working with a confidential informant with whom he had worked with in the past, and he received information that there may possibly be some illegal items located at Mr. Cornelison's residence at 1014 Jefferson Street, Springdale, Arkansas. (Doc. 33, pp. 32-33) Based on that information, Det. Hulsey applied for, obtained, and executed a Search Warrant for the residence. (Doc. 33, p. 33) Mr. Cornelison was not present at the residence when Det. Hulsey arrived to execute the Search Warrant. (Doc. 33, p. 34) It appeared to Det. Hulsey that someone had been living in the home. (Doc. 33, p. 34) During the

2

search, Det. Hulsey located, among other items, six loaded firearms in a locked bedroom. (Doc. 33, p. 35) From his search of the residence, it appeared to Det. Hulsey that the two bedrooms located to the south of the living room were being used for storage, but that it did look like the living room and the master bedroom were in use and that someone was living there. (Doc. 33, p. 36) Photographs of the home, and of a utility bill in Mr. Cornelison's name, were introduced and received in evidence at trial. (Doc. 33, pp. 37-40; Government Exhibits 1-6)

Det. Hulsey testified that there was no sign of forced entry to the door of the southwest bedroom where the firearms were located, and that the door was locked when he got to it. (Doc. 33, p. 39) The six firearms, along with a flak jacket, ammunition magazines, and two bags of ammunition were introduced and received in evidence. (Doc. 33, pp. 40-46; Government Exhibits 7-18) Det. Hulsey attempted to lift some fingerprints from the firearms, but he was unsuccessful in finding any prints. (Doc. 33, pp. 46-47, 53) Det. Hulsey left a copy of the Search Warrant and a receipt for the items seized at the residence. (Doc. 33, pp. 40, 47, 53) The receipt listed the firearms, giving their make, model, caliber, and serial number. (Doc. 33, pp. 54-55)

Mr. Cornelison was arrested on August 3, 2011, and when booked he listed 1014 Jefferson Street, Springdale, Arkansas as his address. (Doc. 33, p. 47) Mr. Cornelison waived his Miranda rights and agreed to speak with Det. Hulsey. (Doc. 33, p. 47) A video of the interview, and a redacted transcript of the interview, were introduced and received in evidence at trial. (Doc. 33, pp. 48-49; Government Exhibits 19 and 20) During the interview, Det. Hulsey asked Mr. Cornelison, "[h]ow did the guns end up at your house?" Mr. Cornelison responded, "[s]ome of them guns were my dad's," "[s]ome were my dad and some were my buddy's," and "they're both passed away." (Doc. 33, p. 50)

3

Concerning the door of the bedroom where the firearms were located, Det. Hulsey confirmed that the door was locked when he arrived, and that he used his driver's license to defeat the lock in less than a minute to get into the room. (Doc. 33, pp. 57-58)

Mr. Cornelison's Parole Officer, Christina Duncan ("Ms. Duncan"), also testified at trial. (Doc. 33, pp. 59-67) She stated that she was assigned to supervise Mr. Cornelison, and as a part of that supervision he informed her where he was living each time he came in to see her. (Doc. 33, p. 60) She testified that Mr. Cornelison initially paroled out to a relative, but beginning in March, 2011 he began living at 1014 Jefferson in Springdale, Arkansas. (Doc. 33, p. 61) Ms. Duncan met with Mr. Cornelison every two weeks, and each time they met she covered where he was living and who he was living with; so, for every two weeks beginning in March, 2011, Mr. Cornelison reported living at 1014 Jefferson, Springdale, Arkansas, and that no one lived with him. (Doc. 33, p. 62) Ms. Duncan testified that on May 20, 2011 she did a "standard home visit" at Mr. Cornelison's home. He was home alone, and she briefly looked around the home. She did not notice anything of concern to her, and it did not appear that anyone else was living there. (Doc. 33, p. 63) She stated that Mr. Cornelison was scheduled to meet with her on July 22, 2011 (after the execution of the Search Warrant), and that he did not appear for that meeting. (Doc. 33, p. 64) During her home visit, she asked if there were any other rooms, and Mr. Cornelison told her that there was one that was locked, and that he did not have a key to it. She testified that she did know ahead of time that the home belonged to Mr. Cornelison's grandfather, and that she "didn't really push the issue." (Doc. 33, p. 65)

The Government also called Tony McCutcheon, a senior special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, to testify at trial. (Doc. 33, pp. 67-69) He testified that

4

he examined the firearms seized from Cornelison's residence, test fired them, and that they are in fact firearms. (Doc. 33, p. 68) He further testified that he has attempted to lift fingerprints from firearms hundreds of times, and that he has never been successful in doing so. (Doc. 33, p. 69)

The morning of the second day of trial, March 28, 2012, the Court met with counsel to discuss the issue of the Government's intent to offer into evidence, pursuant to Rule 404(b), Mr. Cornelison's prior conviction for felon in possession of a firearm. The Court reviewed at length its analysis of applicable case law, and counsel argued their respective positions again to the Court. (Doc. 33, pp. 76-89) The Court then ruled that admission of the prior conviction would be permitted with the giving of a limiting instruction to the jury. (Doc. 33, pp. 89-93)

The Court gave a limiting instruction to the jury advising them that the evidence they were about to receive was being admitted for a limited purpose; that they may consider it only on the issue of Mr. Cornelison's knowledge or intent; and, that they may not convict Mr. Cornelison of the crime he was charged with simply because he may have committed a similar act in the past. (Doc. 33, p. 95) Following that limiting instruction, the Government offered to introduce its Exhibit 21, being a Judgment and Commitment Order in the Circuit Court of Washington County, Arkansas, file-marked July 29, 2010, for Ryan Cornelison, possession of a firearm by certain persons, the offense date being March 27, 2010. Over objection by defense counsel, Government Exhibit 21 was received in evidence. (Doc. 33, p. 96) The Government then rested its case. (Doc. 33, p. 96)

Defense counsel then made a motion, pursuant to Rule 29, F.R.Cr.P., for a directed verdict of acquittal. Counsel argued that the Government's evidence was insufficient as a matter of law to establish that Mr. Cornelison had knowledge of the firearms in the locked room, and that there was no evidence that Mr. Cornelison had the power or intention to exercise dominion and control over

those firearms even if he knew they were there. (Doc. 18; Doc. 33, pp. 97-98) The Court denied the Rule 29 motion. (Doc. 33, pp. 99-104) Following the Court's denial of the Rule 29 motion, defense counsel announced to the Court that the defense did not intend to present any proof, and that the defense was going to rest at that time. (Doc. 33, p. 104) Counsel then renewed the Rule 29 motion, and the Court again denied it. (Doc. 33, p. 105)

Upon being instructed by the Court, the jury retired to deliberate. The jury returned its verdict finding Mr. Cornelison guilty of the offense of knowingly possessing a firearm which had been transported in interstate commerce after he had been convicted of a crime punishable by imprisonment exceeding one year. (Doc. 20; Doc. 33, p. 149) Sentencing was held on July 12, 2012, at which time Mr. Cornelison was sentenced to 120 months imprisonment, three years supervised release, a $12,500.00 fine, and a $100.00 special assessment. (Doc. 24, 35) Judgment was entered on July 13, 2012. (Doc. 27)

Mr. Cornelison timely appealed to the Eighth Circuit Court of Appeals. (Doc. 28) On appeal, he challenged the sufficiency of the evidence, the District Court's decision to admit the 404(b) evidence of his prior conviction, two jury instructions, and the imposition of the fine. The Eighth Circuit Court of Appeals affirmed Mr. Cornelison's conviction and sentence by Opinion filed June 21, 2013. (Doc. 37, Attachment #1) Mr. Cornelison did not file a Petition for Writ of Certiorari with the United States Supreme Court.

On June 20, 2014, Mr. Cornelison filed the instant *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody. (Doc. 38) Mr. Cornelison asserted three grounds for relief: (1) that his counsel failed to call two defense witnesses, Joseph Cornelison and Cheryl Tillery, who were prepared to testify that only Joseph Cornelison had a key

6

to the locked room in which the firearms were located; (2) that counsel's decision to rest without presenting any proof deprived Mr. Cornelison of his right to testify in his own behalf; and, (3) that counsel misadvised Mr. Cornelison regarding the strength of his defense, and that had he been properly advised he would have accepted the plea offer made by the Government. (Doc. 38, pp. 4, 5, 7) Mr. Cornelison subsequently filed an Amended Motion Under 28 U.S.C. § 2255 on September 18, 2014, in which he asserted a fourth ground for relief: that he received ineffective assistance of counsel due to his counsel's failure to challenge the validity of the Affidavit for Search Warrant and Search Warrant and to seek suppression of the evidence obtained pursuant to the search. (Doc. 47, p. 8)

The Government filed its Response to Petitioner's original § 2255 Motion on July 24, 2014, and it attached an Affidavit from Mr. Schisler to its Response. (Doc. 41, 41-1) The Government filed its Response to Petitioner's Amended § 2255 Motion on October 24, 2014[1]. (Doc. 54) Petitioner then filed the sworn Declaration of Joseph Cornelison on October 28, 2014 (Doc. 55), and Petitioner's Reply to the Government's Response was filed on November 17, 2014 (Doc. 58).

On March 24, 2015, the Court entered an Order appointing counsel to represent Petitioner and directing that an evidentiary hearing be scheduled. (Doc. 59) An evidentiary hearing was held on July 28, 2015. (Doc. 70)  The matter is ready for Report and Recommendation.

## II.  Discussion

"A prisoner in custody under sentence . . . claiming the right to be released upon the ground

_____

[1] The Government's Response to Cornelison's Amended Motion refers to an Exhibit A, and it is unclear to the Court whether that reference is to the Exhibit A attached to the Government's Response to Cornelison's original Motion or to another Exhibit A meant to be attached to the Response to the Amended Motion. There is no Exhibit A attached to the Response to the Amended Motion.

that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). "If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). Upon a thorough review of Mr. Cornelison's Motion, as amended, the files and records of this case, along with consideration of the testimony and evidence presented at the evidentiary hearing, the undersigned concludes that Mr. Cornelison's claims lack merit, and the undersigned recommends the denial and dismissal of Mr. Cornelison's § 2255 Motion with prejudice.

### A.  Failure to Call Defense Witnesses

Mr. Cornelison first contends that his counsel violated his constitutional right to the effective assistance of counsel by failing to call two defense witnesses, Joseph Cornelison and Cheryl Tillery, to testify on his behalf at trial. Joseph Cornelison is Mr. Cornelison's grandfather, and he is the owner of the home in which Mr. Cornelison was residing at the time of the execution of the Search Warrant and his subsequent arrest. Cheryl Tillery is Mr. Cornelison's mother, and she had previously lived at the subject home and knew that Joseph Cornelison kept one room locked and off-limits.

### 1.  Affidavits and Evidentiary Hearing Testimony:

Attached to Mr. Cornelison's § 2255 Motion is a sworn Affidavit from Joseph Cornelison

8

(Doc. 38-1) in which he avers the following facts: that he is the owner of the home located at 1014 N. Jefferson St., Springdale, Arkansas; that his son, Mark Edward Cornelison, had lived at that residence before passing away; that his grandson, Ryan Mark Cornelison, was living at that residence at the time of his arrest, and that he had lived there for most of his life; that all utility bills at the house were in his or his wife's names and were paid monthly; that his grandson, as a condition to live at the residence, was to keep the lawn mowed, assist with remodeling, keep everything maintained, and he could not access the bedroom in the southwest corner of the home, nor could he access three sheds that were located at the back of the property; that he had the only set of keys to the lock on the southwest corner bedroom and the locks on the three sheds; that he built the sheds and installed the locks on the sheds, and he installed the lock on the bedroom door; and, that after the passing of his son in 2008, the son's belongings had never been cleared out of the house. The Affidavit references a letter sent by Joseph Cornelison to Hon. Jimm Larry Hendren (marked "received" on July 10, 2012), in which he states that he had been subpoenaed to testify in his grandson's trial; that he had traveled from his home in Hindsville, Arkansas to do so; that he was not called as a witness; and, that counsel called him and told him he was not going to call him to testify and there was no reason to come to the courthouse on the second day of the trial. (Doc. 38-2)

Joseph Cornelison testified at the evidentiary hearing. He acknowledged his signature on the Affidavit during the evidentiary hearing, and he testified that the facts and matters set forth in the Affidavit were true. His Affidavit was received in evidence. (Petitioner's Exhibit 4) He stated that he met defense counsel at Mr. Schisler's office, and that Mr. Schisler told him he would be called to testify at trial. He received a Subpoena, but he was not called to testify during the first day of trial. He related that Mr. Schisler called him after the first day of trial and told him that he would not be

needed the next day. He did not appear for the second day of the trial. He testified that he kept a room in the house occupied by his grandson locked, and that he had tools he kept there. He said that his grandson knew the door to the room was locked, and that he had the only key. He claimed that law enforcement "tore up" the door jamb - like a screwdriver was used to pry the door open - and that the door was also damaged during execution the search of the home. Joseph stated that the firearms depicted in Government's Exhibit 1, a photograph received in evidence during the evidentiary hearing, are not his, and that he did not see the firearms the last time he was in that room. He was unsure when he was last in the room, but he did not think it would have been long before the search was conducted. He stated that, "my memory is not that good." Joseph said that he locked the door to the room every time he accessed the room. He did not think he had replaced the door before the search, but he did replace it after the search. He thought "it looked like they lunged into it," and that the door was not damaged when he last saw it before the search.

Also attached to Mr. Cornelison's § 2255 Motion is a sworn Affidavit from Cheryl Tillery in which she states that she is the mother of Ryan Cornelison; that her son paroled out of the Arkansas prison system to her home in December, 2010, where he resided until March, 2011, when he transferred his parole to his grandfather's house at 1014 N. Jefferson, Springdale, Arkansas; that when she was married to her son's father, Mark Cornelison, they lived at Joseph Cornelison's house for some years, and it was understood that they were not allowed in Joseph's room where he kept personal items, and this room was always locked; that during her visits with her son, she noted that Joseph's room was still off-limits and locked; that after her son's arrest, she went to the police department in Fayetteville, Arkansas to claim the firearms, and she was told by one of the Detectives that the firearms were all stolen and not Mark Cornelison's guns; that in discussing her son's case

with his counsel, she expressed a desire to testify concerning the locked room and that her son did not have access to his grandfather's room; and, that her son's counsel agreed and she was subpoenaed to testify, then she was notified the second day of her son's trial that she would not be testifying. (Doc. 38-3) Ms. Tillery's Affidavit references a letter she sent to Hon. Jimm Larry Hendren (marked "received" on July 10, 2012), in which she states that she is the community director of over 400 multi-family duplexes in Fayetteville and she works closely with the Fayetteville Police Department to be a crime-free neighborhood; that she has testified in Judge Hendren's court before involving a matter in which she turned someone in for illegal activity, and that Judge Henden stated on the record that she was a 100% credible witness; that Joseph Cornelison is also a 100% credible witness; that neither she nor Joseph Cornelison were called to testify, and she cannot understand why they were not called to testify; that the parole officer never asked Joseph Cornelison what was stored in the locked room, and she allowed him to stay there without her or Ryan knowing what was there; and, that she was present for her son's trial and requested to testify. (Doc. 38-4)

During her testimony at the evidentiary hearing, Ms. Tillery identified her signature on her Affidavit, and she testified that the facts and matters set forth in the Affidavit were true. Her Affidavit was received in evidence. (Petitioner's Exhibit 6) She testified that one bedroom in the house occupied by Mr. Cornelison was "off limits to everyone but Joseph." She said that her son's deceased father owned some guns. She related that she met with Mr. Schisler and was told that she would be called to testify at trial. She said she talked to Mr. Schisler at the end of the first day of trial, and she was told to be present for day two of trial. The morning of the second day of trial, she stated that Mr. Schisler told her they were "going to win," and that there would be no need for her or Joseph to testify. Ms. Tillery testified that she was last at the house shortly after Mr. Cornelison's

father passed away. While she could not be exactly sure, she thought she had been to the house within six months prior to the search. She thought the guns belonged to Mr. Cornelison's father or, possibly, a friend of Mr. Cornelison's father. She did not, however, recognize the guns depicted in the photographs received in evidence during the evidentiary hearing. She had been divorced from Mark Cornelison since when Mr. Cornelison was about a year and one-half old. She said that the door to the room where the guns were found would have been locked, and that her son would not have had a key.

Mr. Cornelison's own Affidavit is attached to his § 2255 Motion. (Doc. 38-5) It states, inter alia, that initially upon his release from prison he paroled out to his mother's home, but with the consent of his parole officer and his grandfather, he changed the residence he was paroled at to his grandfather's residence located at 1014 N. Jefferson St., Springdale, Arkansas; that it is his belief that his parole officer was aware that there was a locked bedroom inside the residence that he did not have access to; that it was inside that locked bedroom that he did not have access to that the firearms were discovered during a search of the residence; that he was unaware of the firearms in the locked bedroom as he had never gained access to that room, and he was only made aware that firearms were in the residence by way of the search inventory left at the residence subsequent to the search and seizure; that through discussion with his trial counsel, Jack Schisler, it was agreed that he would not testify due to the likelihood that the Government would introduce his prior felon in possession of firearm conviction, but that any testimony he would want to produce could be presented through his mother, Cheryl Tillery, and his grandfather, Joseph Cornelison, who had been subpoenaed to appear and were in attendance; that it was initially ruled that his prior charge would not be admitted pursuant to F.R.E. 404(b), which lead to Mr. Schisler contacting his mother and

grandfather after the first day of the trial and informing them that they would not be called as witnesses because the Government would not be able to prove a *prima facie* case; that at the beginning of the second day of trial, during an in-chambers conference, the Court determined that his prior conviction would be admissible, and his counsel notified the Court that the defense would rest without putting on any witnesses; that he was not consulted prior to that decision being reached, but was told by Mr. Schisler that he would be filing a Rule 29 motion due to the fact that the Government had not proved its case; that it was not clearly explained to him that there was a possibility that the Rule 29 motion would be denied; that had he known of that possibility, he would have informed Mr. Schisler that he wished to testify in his own defense; and, that his testimony and that of his grandfather could have shown that he did not have access to the room in which the firearms were stored. Mr. Cornelison's testimony at the evidentiary hearing was consistent with the averments in his Affidavit.

Mr. Schisler's Affidavit was attached to the Government's Response to Mr. Cornelison's original § 2255 Motion. (Doc. 41-1) It states that Mr. Cornelison's grandfather was not called as a witness because his truthful testimony would have been damaging to the defense case. Counsel states that while Joseph Cornelison could have testified he had the only key to the locked room where the firearms were found, he also could testify that he was not sure if he locked the room the last time he used it, some two weeks prior to the search that led to the seizure of the firearms. The Affidavit states that Joseph Cornelison was interviewed at his home in Hindsville, Arkansas by Federal Public Defender investigator Mike Schriver prior to trial, and that Mr. Schriver and Mr. Schisler later met Joseph Cornelison at 1014 N. Jefferson, Springdale, Arkansas, where the firearms were found. Counsel states that Joseph Cornelison advised Mr. Schriver that he could not swear in court that the

room was locked on the day of the search or prior to his last accessing the room. Joseph Cornelison could have also testified about damage to the door and door jamb, which appeared to have been caused by tools used to open it without the use of a key. Joseph Cornelison reported that he had replaced the door and the lock by the time of counsel's visit to the home, but even with the replacement door, due to damage to the door jamb, counsel was able to easily open the door with a credit card. Counsel goes on to state that information helpful to the defense was admitted at trial by way of other witnesses, namely Det. Hulsey, who testified that the door was locked on the day of the search and that there was no sign of forced entry, and by Parole Officer Duncan, who testified that during her visit to the home Mr. Cornelison did not have a key to the locked bedroom. Mr. Schisler states that the testimony Cheryl Tillery could have provided would have been of "negligible probative value."

Mr. Schisler testified at the evidentiary hearing. He stated that he had met with Mr. Cornelison several times, but he could not recall the specific dates. He said that he received about 60 pages of discovery materials from David Harris, AUSA. He recalled that in a discussion with Mr. Cornelison about the search, Mr. Cornelison advised that the garage had no windows and that the confidential informant was not truthful. Mr. Schisler did not file a motion to suppress the evidence obtained in the search because he did not feel law enforcement needed a search warrant due to Mr. Cornelison's status as a parolee. He discussed with Mr. Cornelison that he would not be filing a motion to suppress as there was no basis to do so. He stated that Mr. Cornelison told him, "I didn't know they [guns] were there, I didn't have access, let's go to trial."

Mr. Schisler also testified that he saw the door to the room where the firearms were found. He stated that the door had been replaced, but the door jamb had not been repaired. He was able to

14

open the locked door with a credit card, just as Det. Hulsey said he had done. The door jamb looked to have been damaged by someone in an effort to get in to the room without a key.

Mr. Schisler admitted that it would have been probative, and could have been helpful to Mr. Cornelison, to have Joseph Cornelison testify that the door to the room had been damaged; but, he felt that Joseph Cornelison had some "baggage" in that (1) he did not know the guns were in the locked room (raising a question of how, then, did they get there?), and (2) he could not be sure that he locked the door when he was last in the room (about two weeks prior to the search). Another negative of having Joseph Cornelison testify, according to Mr. Schisler, would have been the question about the necessity for having the room locked at all, i.e., "do you not trust your own grandson?" Regarding Ms. Tillery, Mr. Schisler knew that she had lived at the home "some time in the past," but not while Mr. Cornelison had lived there more recently, and he expressed some concern that calling a defendant's mother to testify "looks a little bit desperate" by the defense.

Mr. Schisler testified that he believed they got the information they needed at trial from the testimony of Det. Hulsey and Parole Officer Duncan, including testimony that the door was locked on the day of the search and there was no sign of forced entry, that the house was owned by Joseph Cornelison, that Mr. Cornelison told Ms. Duncan that he did not have a key to the locked bedroom, and that during Ms. Duncan's visit to the home she saw no cause for concern. Mr. Schisler testified during the evidentiary hearing that he felt they "had the fish in the boat" with the trial testimony of Det. Helsey and Parole Officer Duncan, and that the potential negative aspects of Joseph Cornelison and Cheryl Tillery testifying outweighed the potential positive aspects of their anticipated testimony. This feeling is reflected in Government Exhibit 3, Mr. Schisler's trial notes, which indicate, "got all fish" regarding Det. Hulsey's testimony, and "gold" next to his notes on Ms. Duncan's testimony.

Mr. Schisler added that Judge Hendren's ruling, made the morning of the second day of trial, to allow the Rule 404(b) evidence of Mr. Cornelison's prior conviction for felon in possession of a firearm, did not affect his decision not to call either Joseph Cornelison or Cheryl Tillery to testify at trial. While he could not recall specifically when, Mr. Schisler testified that he told Mr. Cornelison "probably on day two" that he was not going to call Joseph Cornelison or Cheryl Tillery to testify because they already had the information they needed in the case. Mr. Cornelison apparently agreed that the testimony of Ms. Duncan was exculpatory because he referred to it in a letter he directed to Judge Hendren prior to his sentencing, stating, "I beg of you to re-visit the testimony of my Parole Officer[,] Christy Duncan[,] at my trial before handing down a sentence in this case to an innocent man ... Her own testimony from my trial will prove everything I am saying." (Government Exhibit 5)

Mr. Cornelison also filed the Declaration of Joseph Cornelison in support of his claims. (Doc. 55) At the evidentiary hearing, however, Joseph Cornelison unequivocally testified that the document *did not* bear his signature. Mr. Cornelison denied that he signed it, nor anyone acting for him, and he stated that the signed declaration had been returned to him in the mail, and he thought that perhaps his grandmother may have signed it. The undersigned gives no weight whatsoever to the averments contained in the Declaration of Joseph Cornelison (Doc. 55).

## 2.  Analysis:

Mr. Cornelison has specifically identified those witnesses whom he would have had his trial counsel call to testify at trial, and he articulated what testimony in his defense such witnesses would offer. The affidavits supporting his § 2255 Motion, as amended, presented a factual dispute concerning what information was related to his counsel by Joseph Cornelison and Cheryl Tillery

prior to trial; whether counsel initially intended to call them as witnesses for the defense, and if so, why the decision was then made not to call them after learning of the Court's 404(b) evidence ruling; and, whether counsel consulted with Mr. Cornelison about not calling any defense witnesses prior to announcing to the Court that the defense would rest without presenting any proof. An evidentiary hearing was held on July 28, 2015 to more fully develop the evidence regarding those questions of fact.

From the testimony and evidence presented during the evidentiary hearing, it is clear to the undersigned that defense counsel thoughtfully considered the decision of whether or not to call Joseph Cornelison and Cheryl Tillery as defense witnesses at trial. Counsel carefully weighed the positives and negatives of doing so. The potential positives of calling these witnesses included: that the door to the subject bedroom was locked and secure, and that Joseph had the only key. The potential negatives of calling Joseph Cornelison included: he could not swear for sure that he locked the door to the room the last time he had been in the room before the search; the question of why the door needed to be locked in the first place (raising a question of his distrust of his grandson); the damage to the door jamb and frame; and, he did not put the guns in the room, he had not seen the guns when he was last in the room two weeks before the search, and he did not know the guns were there, potentially causing the jury to wonder how the guns got in the room - with the likely suspect being Mr. Cornelison, the sole occupant of the house. Also important in Mr. Schisler's decision not to call Joseph Cornelison as a witness at trial was Mr. Schisler's conversation with the Government's counsel during trial, who advised Mr. Schisler that they had also spoken with Joseph Cornelison, leading Mr. Schisler to believe that the Government was aware of these negative aspects of Joseph Cornelison's potential testimony. According to Mr. Schisler, this weighed heavily in his decision,

17

as he did not want the Government to call Joseph Cornelison as a witness. Ms. Tillery had lived in the home years before, and she knew Joseph kept the room locked, but she had not been there during the time of the events in question. Had she been called to testify, the potential negatives would have included the lack of recency of her knowledge and the trust issue. In light of the trial testimony of Det. Hulsey and Parole Officer Duncan, Mr. Schisler believed that, in his words, he "had the fish in the boat," thereby eliminating the need, and the potential negatives and risks, of calling Joseph Cornelison and Cheryl Tillery to testify. Based upon these considerations, Mr. Schisler made a strategic decision during the trial not to call either Joseph Cornelison or Cheryl Tillery as witnesses.

Mr. Cornelison's ineffective assistance of counsel claim for failing to call Joseph Cornelison and Cheryl Tillery as witnesses at trial is untenable. Decisions regarding which witnesses to call are strategic decisions "normally left to counsel's judgment" and should "not be second-guessed by hindsight." *United States v. Morris*, 2013 WL 3716602 (8th Cir. 2013) (quoting *Fretwell v. Norris*, 133 F.3d 621, 627 (8th Cir. 1998). The Eighth Circuit has held that the decision not to call a witness is a "virtually unchallengeable" decision of trial strategy. See *United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005) (internal citations omitted). Mr. Schisler's decision not to call these two witnesses "does not fall outside this wide perimeter of protection." *Id.* While testimony from Joseph Cornelison and Cheryl Tillery might have provided some benefits, it was not objectively unreasonable for Mr. Schisler to decide that the potential costs of calling them outweighed the potential benefits for the reasons discussed above.

Impeachment of these two witnesses could have elicited the negative aspects of their anticipated testimony mentioned above. Two of the potential negatives could have been highly significant in undermining the defense: one, the question of why the room needed to be locked at all,

18

raising the inference that Joseph did not trust his own grandson; and, two, Joseph's lack of knowledge of the guns being present in the room, raising the question of how the guns got there, with the logical inference being that the sole occupant of the house, Mr. Cornelison, must have had something to do with the presence of the guns. Further, as the Court noted in *Staples*, "there is considerable risk inherent in calling any witness because if the witness does not hold up well on cross-examination, the jurors might draw unfavorable inferences against the party who called him or her." *Id*. at 489. Further still, because of their relationship to Cornelison, the prosecutor could have argued that the witnesses' testimony was shaped by familial loyalty.

Given the highly deferential presumption of competent assistance, the prospects for impeachment, and the risk inherent in calling any witness, the undersigned concludes that defense counsel did not perform in an objectively unreasonable manner by deciding not to call Joseph Cornelison and/or Cheryl Tillery to testify at trial. Because counsel's performance was not unreasonable, we need not address the question of whether his performance prejudiced Mr. Cornelison's defense. *See United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003) (if a movant fails to show deficient performance by counsel, the court need proceed no further in its analysis of an "ineffective assistance" claim).

## B.  Denial of the Right to Testify

Mr. Cornelison next contends that his counsel violated his constitutional right to the effective assistance of counsel when his counsel did not allow him to testify in his own behalf at trial.

## 1.  Affidavits and Evidentiary Hearing Testimony:

Mr. Cornelison alleges that he and his counsel originally agreed that he would not testify due to the possibility that doing so would permit the Government to disclose his prior felony convictions.

He alleges that the prior convictions were originally excluded pursuant to F.R.E. 404(b), causing his counsel to believe that the Government would be unable to prove a *prima facie* case of possession and lead to him calling off his witnesses before the second day of trial. Then, he alleges, in an in-chambers conference prior to day two of the trial, the presiding judge reversed his earlier decision regarding prior offenses, and Mr. Schisler informed the Court that the defense would be resting without presenting any witnesses. Mr. Cornelison goes on to allege that, "Mr. Schisler then informed Mr. Cornelison of the events and that he would file a Rule 29 motion on his behalf due to the government's failure to prove a prima facie case," and it was his "present sense belief that the trial was ending and he would soon be released, as the possibility of a denial of the motion was not disclosed." Finally, Mr. Cornelison alleges that had he known of the possibility of denial of the Rule 29 motion, he would have insisted in testifying in his own defense. (Doc. 47, p. 5) Mr. Cornelison's Affidavit supporting these allegations is attached to his Amended § 2255 Motion. (Doc. 47, Exhibit E)

In response, the Government refers to the Affidavit of Mr. Schisler. (Doc. 41-1, Exhibit A) In it, Mr. Schisler states that Mr. Cornelison was advised that the decision to testify, or not testify, was his, and that "I did advise that I felt it would not be a good idea for him to testify, as he had other felony convictions beyond the felon-in-possession conviction that came into evidence over objection under Rule 404(b) that had not been revealed to the jury and could be used to impeach him." (Doc. 41-1, Exhibit A, p. 2) Those priors, Mr. Schisler adds, include convictions for aggravated assault and delivery of a controlled substance which occurred less than ten years before. Mr. Schisler states that the admission of the 404(b) evidence, "while extremely damaging to Mr. Cornelison's case, had no impact on my advice as to whether or not Mr. Cornelison should testify at trial." (Doc. 41-1, Exhibit

A, p. 3) Mr. Schisler further states that he advised Mr. Cornelison of the nature of the Rule 29 motion, that Mr. Cornelison "was not promised that the motion would be granted by the court," and that the filing of the motion "had nothing to do with whether or not he would testify at his trial." (Doc. 41-1, Exhibit A, p. 3)

An examination of the trial transcript shows that a lengthy in-chambers conference was held between the Court and counsel the morning of the second day of trial. (Doc. 33, pp. 76-89) During this conference, the matter of the 404(b) evidence was discussed, and the Court indicated that, "[t]he Court's initial determination was that that (proof of the prior conviction for felon-in-possession of a firearm) should not be permitted . . .", and "[t]he problem that the Court saw at the time and was discussed at length with counsel was whether under the fourth requirement enunciated by *Gaddy*[2] and many other cases, the probative value of the conviction would be substantially outweighed by the obvious prejudicial effect of that conviction." (Doc. 33, p. 77) The Court went on to explain that, "my perception, I think, of *Old Chief*[3] was misplaced," and "I don't think it reaches the situation in which we are now in." (Doc. 33, p. 79) After more discussion and analysis of the issue, the Court stated, "[s]o having spent quite a bit of time on this, I think the ruling must be that if the United States offers the previous conviction, I will overrule the objection to it and I will feature a limiting instruction." (Doc. 33, p. 86) Upon concluding the in-chambers conference, the trial convened and the Government introduced Mr. Cornelison's prior conviction for felon-in-possession of a firearm into evidence. (Doc. 33, p. 96, Exhibit 21) Following that, the Government rested its case. (Doc. 33, p. 96)

---

[2] *United States v. Gaddy*, 532 F.3d 783 (8th Cir. 2008).

[3] *Old Chief v. United States*, 519 U.S. 172 (1997).

The jury was then withdrawn from the courtroom, and Mr. Schisler made a Rule 29 motion on Mr. Cornelison's behalf. (Doc. 33, pp. 96-98) The Court, upon hearing the Government's response to the motion, discussed the motion and denied it. (Doc. 33, pp. 99-104) At that point, Mr. Schisler announced to the Court that the defense did not desire to go forward and present proof, and that "[w]e're going to rest at this time." (Doc. 33, p. 104) There is no indication in the trial record that Mr. Schisler conferred with Mr. Cornelison after the Court's ruling on the 404(b) evidence to discuss Mr. Cornelison's decision to either testify or not testify. The trial record shows that the Court did not address Mr. Cornelison directly about his decision regarding whether or not to testify. (Doc. 33, pp. 104-106)

During the evidentiary hearing, Mr. Schisler testified that Judge Hendren's ruling the morning of the second day of trial to allow the 404(b) evidence was "bad ... very bad," because it went to the issue of Mr. Cornelison's knowledge of the firearms, but it did not go the issue of Mr. Cornelison's access to the firearms. He felt that the 404(b) evidence "couldn't be explained by witnesses." Mr. Schisler stated that prior to trial he had explained to Mr. Cornelison that if the Court were to allow the 404(b) evidence, "you might want to consider pleading guilty to this," and Mr. Cornelison told him "no, I'm not going to do it." Mr. Schisler denied telling Mr. Cornelison that "we're going to win anyway" after the Court's ruling to allow the 404(b) evidence. According to Mr. Schisler, he did not connect the Rule 29 motion he planned to make with the Court's 404(b) ruling, as "those were separate things." Mr. Schisler thought he had "a legitimate motion," so much so that instead of just making it orally as he normally does, he had prepared a written Rule 29 motion for submission to the Court.

Concerning Mr. Cornelison's right to testify, Mr. Schisler testified that he discussed this

22

briefly with Mr. Cornelison at counsel table after the Government had rested and after his Rule 29 motion had been made and denied by the Court. He explained to Mr. Cornelison that "we don't need to call any witnesses;" that they already had the information they needed to make their argument (i.e., that Mr. Cornelison did not have knowing possession of the firearms) in the record from the Government's witnesses; that not calling witnesses included not calling Mr. Cornelison as a witness for reasons that had been discussed with him previously; and, that they were going to rest, which they did. A key reason  for Mr. Cornelison not to testify was his criminal history, which included prior felony convictions for aggravated assault, distribution of marijuana, and the Government could have gotten into the details of his prior felon-in-possession of firearm conviction. Mr. Schisler was also concerned that the Government could have presented proof of a scam perpetrated by Mr. Cornelison in which he claimed he had been bitten by a copperhead snake while at Wal-Mart (see Government Exhibit 9), which led to Mr. Cornelison pleading guilty to filing a false 911 report. He further testified that there was "no good reason for [Mr. Cornelison] to testify," that there was "no upside to [Mr. Cornelison] testifying ... *ever*," and that the Court's 404(b) evidence ruling, and the denial of the Rule 29 motion, "had absolutely nothing to do" with the decision that it would be a bad idea for Mr. Cornelison to testify. Mr. Schisler recalled that Mr. Cornelison "seemed to agree with my advice." Mr. Schisler stated that Mr. Cornelison never told him that he wanted to testify in his own behalf. When Mr. Schisler announced to the Court that the defense was resting without calling any witnesses, Mr. Cornelison sat quietly at counsel table. In response to Mr. Cornelison's assertion that Mr. Schisler made some promise that the Rule 29 motion would be granted, and that had he known of the possibility of denial of the Rule 29 motion he would have insisted in testifying in his own defense, Mr. Schisler testified that making such a promise would be "a very bad practice," and

23

that he made no such promise. Finally, in Mr. Cornelison's letter sent directly to Judge Hendren prior to sentencing (Government Exhibit 5), Mr. Cornelison does not complain about being denied the right to testify.

Mr. Cornelison testified that there was no discussion about testifying on his own behalf before the defense rested without calling any witnesses. He admitted, however, that he never told his counsel that he wanted to testify, and that when things moved forward and Mr. Schisler announced to the Court that the defense was resting without calling any witnesses, he did not say "stop, I want to testify."

## 2. Analysis:

A criminal defendant has a constitutional right to testify in his or her own defense. *Rock v. Arkansas*, 483 U.S. 44, 49, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). This right is derived from the Fourteenth Amendment's due process clause, the Sixth Amendment's compulsory process clause, and the Fifth Amendment's prohibition on compelled testimony. *Rock*, 483 U.S. at 51-53. "Because the right to testify is a fundamental constitutional guarantee, only the defendant is empowered to waive the right." *United States v. Bernloehr*, 833 F.2d 749, 751 (8th Cir. 1987). The Court recognizes, however, that a knowing and voluntary waiver of the right to testify may be found based on a defendant's silence when his counsel rests without calling him to testify. *Id*. In *Bernloehr*, the Court "stressed that under such circumstances the defendant must act 'affirmatively' rather than apparently 'acquiesc[ing] in his counsel's advice that he not testify, and then later claim[ing] that his will to testify was overcome.'" *Id*. (internal quotation omitted). *See also Frey v. Schuetzle*, 151 F.3d 893, 898 (8th Cir. 1998).

Mr. Schisler's testimony reflects his position that the Court's ruling regarding admission of

24

the 404(b) evidence, and the Court's denial of the Rule 29 motion, had nothing to do with whether or not Mr. Cornelison should testify at trial. Mr. Schisler's testimony makes clear his belief that there was "no good reason for [Mr. Cornelison] to testify," and that there was "no upside to [Mr. Cornelison] testifying ... *ever*." Like the facts in *Frey*, Mr. Schisler informed Mr. Cornelison that he had a right to testify, but he advised Mr. Cornelison against testifying. Also like the facts in *Frey*, Mr. Cornelison seemed to agree with his counsel's advice not to testify. Unlike the facts in *Frey*, Mr. Cornelison testified that he never told his attorney that he wanted to testify. When things moved forward, and counsel announced to the Court that the defense was resting without calling any witnesses, Mr. Cornelison did not act affirmative to say "stop, I want to testify."

Considering the reasons for which Mr. Schisler advised Mr. Cornelison not to testify, including several felony convictions and a conviction for making a false 911 report, which criminal history would have given the jury a picture of Mr. Cornelison as a violent offender, a drug dealer, and a scammer, it cannot be said that Mr. Schisler's advice "fell below an objective standard of reasonableness." *See Wiggins v. Smith*, 539 U.S. 510, 522, (2003) (quoting *Strickland*, 466 U.S. at 688). Thus, counsel's advice that Mr. Cornelison not testify would not satisfy the "deficient performance" prong of an ineffective assistance of counsel claim. *See United States v. Ledezma-Rodriguez*, 423 F.3d 830, 836 (8th Cir. 2005) (to prove an ineffective assistance claim, the movant must first show that counsel's performance was "deficient").

Upon such reasonable advice, Mr. Cornelison chose to exercise his constitutional right not to testify. When it was apparent that his counsel was resting the defense without calling any witnesses, Mr. Cornelison took no affirmative action to notify the Court that he wanted to testify on his own behalf. Mr. Cornelison does not assert that his will to testify was overcome, nor does the

record suggest that counsel somehow coerced Mr. Cornelison into not testifying or that Mr. Cornelison was "muzzled." Instead, the record demonstrates Mr. Cornelison's knowing and voluntary waiver of his right to testify by acquiescence in his counsel's advice not to testify. There is no hint on the record of any conflict between counsel and Mr. Cornelison whether or not he should testify, which might have obligated the Court to inquire of Mr. Cornelison directly whether he was waiving his right to testify, when counsel stated his intention to rest without calling any witnesses. *Cf. Bernloehr*, 833 F.2d at 752 (finding no obligation on the court to inquire directly of the defendant whether defendant was waiving his right to testify, when there was no evidence on the record of any conflict between the defendant and his counsel on that issue).

Because the undersigned finds that Mr. Cornelison knowingly and voluntarily waived his right to testify, by acquiescing when counsel rested the defense without calling him, and that counsel did not act ineffectively in advising Mr. Cornelison to make such a waiver or otherwise impede his right to testify, the Court need not consider the "prejudice" prong of Mr. Cornelison's ineffective assistance of counsel claim. *See United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir. 2003). Even so, and while Mr. Cornelison may not be happy now with his decision not to testify, he has offered nothing more than a shadow of a possibility that counsel's advice that he should not testify could have had "'some conceivable effect on the outcome of the proceeding,'" which simply is not enough. *See Pfau v. Ault*, 409 F.3d 933, 939 (8th Cir. 2005) (quoting *Strickland*, 466 U.S. at 693); *see also Frey*, 151 F.3d at 898 ("post-conviction dissatisfaction with this decision" not to testify does not establish a violation of the right to testify).

### C. Failure to Correctly Advise Defendant During Plea Negotiations

Mr. Cornelison's third ground for habeas relief is his claim that counsel misadvised him

about constructive possession during plea negotiations, and that had he been advised correctly he would have taken a plea offer.

### 1. Affidavits and Evidentiary Hearing Testimony:

Mr. Cornelison alleges that he was informed by his trial counsel that he should not accept a plea offer due to the fact that he had the affirmative defense of "mere presence." He further alleges that he could not rely on the "mere presence" defense as he was the sole occupant of the home in which he resided, and that had he "been correctly informed as to his lack of affirmative defense in this matter, then he would have accepted the plea offer submitted by the government." (Doc. 47, p. 7) The Court observes that Mr. Cornelison's Affidavit attached to his Amended § 2255 Motion does not address this issue at all. (Doc. 47, Exhibit E)

Mr. Schisler states in his Affidavit that he did not advise Mr. Cornelison that he had any affirmative defense, and that the defense applicable to his case, based on research prior to trial and as set forth in the Rule 29 motion, was that the Government could not prove that Mr. Cornelison had "knowing possession" of the firearms. (Doc. 41-1, p. 3) The Affidavit does not, however, address what discussions counsel had with Mr. Cornelison concerning plea negotiations; whether the Government had even made a plea offer, and if so, when it was communicated to Mr. Cornelison; what advice was given in connection with any plea offer; and, what Mr. Cornelison's position was regarding any plea offer. An evidentiary hearing was held to more fully develop the record on these issues.

At the evidentiary hearing, Mr. Schisler acknowledged that a proposed plea offer was sent to him by David Harris, AUSA, on March 5, 2012. The plea offer was that Mr. Cornelison plead guilty to the one count Indictment, and the Government would not oppose Mr. Cornelison receiving

27

a sentence reduction for acceptance of responsibility. Mr. Schisler stated that he conveyed the plea offer to Mr. Cornelison, but that Mr. Cornelison was not interested in entering into a plea agreement. While uncertain of the date, Mr. Schisler advised that he would have discussed the plea offer with Mr. Cornelison when they discussed application of the sentencing guidelines, because if Mr. Cornelison pled guilty then his guidelines range would be different because of acceptance of responsibility. Mr. Schisler stated that Mr. Cornelison was "totally aware" that if he pled guilty he would be in position to receive a sentence reduction for acceptance of responsibility. On March 25, 2012, Mr. Schisler discussed the plea offer again with Mr. Cornelison when they discussed the possibility of the 404(b) evidence coming in at trial. Advise was given by Mr. Schisler that "going to trial or pleading guilty is his call," and that he could not make Mr. Cornelison do either one. He did tell Mr. Cornelison that "this was not the worst 922(g) case he'd seen in his life;" he explained that this was a constructive possession case; and, Mr. Cornelison was made aware of the positives and negatives of the case. Mr. Schisler's handwritten notes from his meeting with Mr. Cornelison on March 25, 2012 (Government Exhibit 8) reflect that Mr. Schisler told Mr. Cornelison that he "might want to consider plea if [Government] will still recommend 3 [points] [for acceptance of responsibility]," and that Mr. Cornelison said "no to plea."

According to Mr. Schisler, Mr. Cornelison consistently maintained his innocence. On only a couple of occasions did Mr. Cornelison bring up the possibility of a plea. On one occasion, he indicated that he would be willing to plead no contest if he could get a recommendation of probation. That was rejected because Mr. Cornelison was not probation eligible under the sentencing guidelines. Later, Mr. Cornelison said that he would be willing to plead guilty if he could get out of jail prior to sentencing. Mr. Schisler did not take either of those two approaches as being "serious

28

expressions of a willingness to plead guilty," as Mr. Cornelison still maintained that he did not know of the presence of the guns in the home, and that he had no access to the room where the guns were found, which assertions made it difficult to enter a guilty plea since Mr. Cornelison was claiming that he could not lay the factual foundation for a guilty plea. Mr. Schisler further testified that he did not tell Mr. Cornelison that he had an affirmative defense because "mere presence" is not an affirmative defense; it is a theory of the defense.

In his testimony, Mr. Cornelison admitted that in his letter to Judge Hendren he asserted that "I am an innocent man." He also testified that he was unaware of the firearms because he had never gained access to the room in which they were found. He testified that he is "absolutely innocent," and that he would not come in to court and lie and say he was guilty when he was not. In an attempt to bolster his claim, Mr. Cornelison testified that if Mr. Schisler had explained to him that "just being at the house with the guns was enough to prove constructive possession," then "I would have had no choice but to plead guilty." When pressed on the point, Mr. Cornelison again stated, "I am innocent," but that he would have pled guilty if he had "known how constructive possession worked." He added that, "I think people plead guilty to stuff they're innocent of all the time." When asked if he was telling this Court if he was an innocent man, Mr. Cornelison responded, "yes, sir."

**2.  Analysis:**

First, the undersigned disagrees with Mr. Cornelison that counsel misadvised him about constructive possession of the firearms and the nature of his defense. Contrary to Mr. Cornelison's allegations, Mr. Schisler was clear in his testimony that he never told Mr. Cornelison that he had an "affirmative defense" of "mere presence," and that "mere presence" was only a theory of the defense. This is borne out by the submission of a proposed "theory of the defense" jury instruction on "mere

presence" which was rejected by the Court - a ruling upheld on direct appeal. (Doc. 37-1, pp. 9-11) It is apparent to the undersigned that Mr. Schisler was well aware that the three possible affirmative defenses in a federal prosecution (i.e., alibi, reliance on official authority, and insanity) had no application to this case, and that "mere presence" related to focusing on "knowing possession" (proof beyond a reasonable doubt of knowledge and the ability to exercise dominion and control) of the firearms as the primary theory of the defense. For this reason, the undersigned cannot conclude that counsel misadvised Mr. Cornelison concerning the nature of his defense, or that counsel's advice was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 689.

Mr. Cornelison's testimony that even though he is an innocent man he would have nonetheless pled guilty had he known that constructive possession was sufficient to support a conviction is unconvincing. Such a contention is either "contradicted by the record" or "inherently incredible" in light of the record of Mr. Cornelison consistently maintaining his innocence throughout the proceedings. *See Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995). According to counsel, Mr. Cornelison always denied knowledge of the presence of the guns in the home, and he always denied having access to the room in which the guns were found. Mr. Cornelison's testimony at the evidentiary hearing was no different. Counsel further stated that Mr. Cornelison always expressed a desire to proceed to trial, except for two occasions: once when he indicated some willingness to plead no contest in exchange for the Government's recommendation of probation (which was rejected), and another time when he expressed some willingness to plead guilty if he could be released from jail pending sentencing. Neither of these occasions were considered by Mr. Schisler to be serious for the reason that Mr. Cornelison continued to maintain that he did not know the guns were in the home, or that he had access to them, which would have

prevented establishing a factual basis for a plea of guilty. Interestingly, Mr. Cornelison testified that "people plead guilty to stuff they're innocent of all the time," but he stated that he would not lie to the Court in order to plead guilty.

"A defendant who maintains his innocence at all the stages of his criminal prosecution and shows no indication that he would be willing to admit his guilt undermines his later § 2255 claim that he would have pleaded guilty if only he had received better advice from his attorney." *See Sanders v. United States*, 341 F.3d 720, 723 (8th Cir. 2003) (internal citations omitted). Mr. Cornelison bore the burden of producing some credible, non-conclusory evidence that he would have pled guilty had he been properly advised. *Id*. He has failed to do so.

### D.  Failure to Challenge Affidavit for Search Warrant and Search Warrant

Mr. Cornelison's final ground for relief is that his counsel's performance was constitutionally deficient in that counsel failed to challenge the Affidavit for Search Warrant and the Search Warrant that ultimately produced the evidence upon which Mr. Cornelison was convicted.

### 1.  Affidavits and Evidentiary Hearing Testimony:

Mr. Cornelison alleges that "[t]here was no reliability proven on the informant and the Detective falsified the affidavit to get the search warrant." (Doc. 47, p. 8) More specifically, he states that contrary to the information set forth in the Affidavit for Search Warrant, the CI never stated that narcotics would be found at the shop, and no narcotics were viewed at the house or the shop; that there are no photos or video of the allegedly stolen Ford Mustang and/or auto parts, and that, in fact, the shop where those items were reportedly viewed by the Detective was completely sealed from the naked eye and locked at all times; that "[c]ounsel knew this and made no attempt to move to suppress the evidence allegedly seized at the residence;" and, that there is no proof to support the

Detective's conclusory statement that the CI's "reliability has been previously established," and counsel never investigated or attacked this matter. (Doc. 47, p. 9)

The Government contends that a practical, common-sense inquiry "would unquestionably yield a fair probability that contraband or evidence of a crime involving the Mustang and auto parts would be found at the residence along with methamphetamine." (Doc. 54, p. 5) The Government also argues that since Mr. Cornelison was "subject to supervised release following a term of imprisonment," and the probation officer had reasonable suspicion supporting the conclusion that evidence of a violation of a term of Mr. Cornelison's supervision would be found on the premises, that any motion to suppress would have been without merit. (Doc. 54, p. 5)

Mr. Cornelison alleges that his counsel knew that information contained in the Affidavit for Search Warrant was false, and that his counsel failed to act on that knowledge to challenge the evidence seized during the search. (Doc. 47, p. 9) The Government counters by saying that "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," citing *United States v. Rice*, 449 F.3d 887, 897 (8th Cir. 2006). The Government then states that, "[i]t is clear that Cornelison's counsel made a strategic decision not to challenge evidence gathered pursuant to the search warrant . . . as he believed Cornelison's status as a parolee justified a warrantless parole search." (Doc. 54, p. 7) The Government also states that while Mr. Schisler "does give pause to Detective Hulsey's statement that the narcotics were directly confirmed by the investigators, because nothing drug related was observed by the investigators, he concluded it was reasonable for Detective Hulsey to believe the confidential informant's statements concerning the stolen property." (Doc. 54, p. 7) Finally, the Government points out that Mr. Schisler states that, "Cornelison never informed him that the outbuilding described in the affidavit was

32

completely sealed from the naked eye and locked at all times." (Doc. 54, p. 7) In support of all of these statements attributed to Mr. Schisler, the Government references an "Exhibit A." The problem the Court had, however, was that the "Exhibit A" attached to the Government's Response to Mr. Cornelison's original § 2255 Motion, being an Affidavit from Mr. Schisler, does not address these matters (since the issue relating to the failure to challenge the search warrant had not yet been asserted). No other "Exhibit A," some subsequent Affidavit from Mr. Schisler addressing the search warrant issue, was attached to the Government's Response to Mr. Cornelison's Amended § 2255 Motion. In light of this, the Court believed that a question of fact existed regarding counsel's performance in not challenging the validity of the Affidavit for Search Warrant and the Search Warrant, and an evidentiary hearing was held to further develop the evidence on this claim.

At the evidentiary hearing, Det. Hulsey testified that he did not believe he had probable cause to search based solely on the information obtained from his confidential source. He stated that he contacted Mr. Cornelison's Parole Officer, Ms. Duncan, about going out to Mr. Cornelison's home because she could do a warrantless search, and that it was Ms. Duncan's decision to go out to the Cornelison property. Det. Hulsey said he met with Ms. Duncan at Mr. Cornelison's home on July 13, 2011, and they walked around the property to take a look at things. Mr. Cornelison was not present, and they did not enter the home. Photographs of an outbuilding located on the Cornelison property were received in evidence. (Exhibit 2) The photos depict an old brick building with two wooden doors locked by a combination lock. Det. Hulsey testified that when he pulled on the doors to see if they were actually secure, a crack between the doors was created, and he could see inside the building through the crack between the doors. He testified that through the crack he saw the red Ford Mustang that was reportedly stolen. This, according to Det. Hulsey, corroborated the

information provided to him by the confidential informant that a stolen Ford Mustang would be located on the Cornelison property, and at that point he believed he had probable cause to obtain a search warrant. With this information, Det. Hulsey prepared his Affidavit for Search Warrant (Exhibit 1), and he obtained a Search Warrant (Exhibit 3) on July 13, 2011. (He explained that the date of July 11, 2011 on the Search Warrant is a typographic error he made while preparing the Search Warrant.) He recalled his testimony at Mr. Cornelison's trial that he accessed the locked room where the guns were located by using a credit card, and that doing so took less than one minute. He identified a photo (Government Exhibit 1) that depicts where the firearms were found once access to the locked room was obtained. The photo also depicts marks on the door jamb which, while not indicative of "forced entry" according to Det. Hulsey, would be consistent with someone bypassing the lock and getting into the room.

Det. Hulsey also testified that Mr. Cornelison was charged in state court in connection with the theft of the Ford Mustang; that a suppression hearing was held in that state prosecution; that the search was upheld and suppression denied; and, that Mr. Cornelison pled guilty to and was convicted of theft by receiving. (Government Exhibit 2)

Mr. Schisler testified that he discussed the search with Mr. Cornelison, including Mr. Cornelison's statement that the outbuilding had no windows and his belief that the confidential informant was not truthful, and he stated that he did not feel a search warrant was needed because of Mr. Cornelison's status as a parolee. He told Mr. Cornelison that he would not be filing a motion to suppress because there was no basis to do so. Mr. Schisler described obtaining the Search Warrant as a "belt and suspenders" move by Det. Hulsey. A copy of Mr. Cornelison's Order of Conditional Release from the State of Arkansas, Board of Parole, was received in evidence. (Government Exhibit

34

10) Among the conditions of release applicable to Mr. Cornelison was a condition entitled "Search and Seizure" (¶ 10), which provided: "you must submit your person, place of residence, and motor vehicles to search and seizure at any time, day or night, with or without a search warrant, by any Department of Community Correction Officer." The Conditions of Release form was signed by Mr. Cornelison on December 3, 2010.

Mr. Schisler explained that in his opinion a confidential informant's report, plus a corroborated fact, equals probable cause. He also stated that while he did not think the legal analysis would get to that point, if it did, the "good faith" exception to the exclusionary rule for a search found to be invalid would apply under *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

**2.  Analysis:**

The failure to move to suppress what is essentially the only evidence against a defendant can be sufficient to establish a lack of diligence on the part of the attorney if the motion would have succeeded. *See United States v. Easter*, 539 F.2d 663 (8th Cir. 1976), *cert. denied* 434 U.S. 844, 98 S.Ct. 145, 54 L.Ed.2d 109 (1977). Thus, in determining whether there was prejudice from the asserted lack of diligence to make a motion to suppress, the Court must look into the underlying issue of whether a motion to suppress, if one had been made, would have been successful.

The Arkansas Supreme Court has held that a parolee's advance consent, such as evidenced by Mr. Cornelison's signed Conditions of Release form, is valid because the parolee remains in the custody of the penal institution from which he is released, and the "special needs of the parole process call for intensive supervision of the parolee making the warrant requirement impractical." *See Cherry v. State*, 302 Ark. 462, 467, 791 S.W.2d 354, 357 (1990). Additionally, a parole officer

may enlist the aid of the police, and a police officer may act at the direction of the parole officer, without overreaching the scope of the search. *Id*.; *Hatcher v. State*, 2009 Ark. App. 481, 324 S.W.2d 366 (2009); *Lewis v. State*, 2014 Ark. App. 136, 432 S.W.3d 145 (2014).

The United States Supreme Court dealt with nearly identical consent language, as it applied to a probationer, in *United States v. Knights*, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001). The Court there noted that "inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *Id*., 534 U.S. at 119 (internal citations and quotation marks omitted). As the probation order did in *Knights*, the Conditions of Release form here clearly expressed the search and seizure condition, and Mr. Cornelison was unambiguously informed of it. The parole search and seizure condition thus significantly diminished Mr. Cornelison's reasonable expectation of privacy. *Id*. 534 U.S. at 119-20. The Supreme Court in *Knights* held that, "[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable," and "[t]he same circumstances that lead us to conclude that reasonable suspicion is constitutionally sufficient also render a warrant requirement unnecessary." *Id*. 534 U.S. at 121. *See also United States v. Vincent*, 167 F.3d 428, 431 (8th Cir. 1999) ("When the terms of a probation order provide the probationer is subject to a warrantless search of his or her home at any time, and that term is reasonable, the probationer has no Fourth Amendment right to be free from a warrantless search.").

Considering these authorities, we agree with Mr. Schisler that Det. Hulsey's action in obtaining a Search Warrant, in addition to having Ms. Duncan's authority to search pursuant to Mr. Cornelison's consent in the Conditions of Release form, was an unnecessary "belt and suspenders"

36

move. Mr. Schisler cannot, therefore, be faulted for concluding that there was no basis to file a motion to suppress the evidence seized during the search of Mr. Cornelison's home on July 13, 2011. Such a motion to suppress, had one been made, would not have been successful in this case. The undersigned concludes that Mr. Cornelison has failed to establish ineffectiveness of counsel on this claim. There was neither prejudice to his defense, since a motion to suppress would not have succeeded, nor lack of due diligence on the part of Mr. Schisler, since an attorney will not be held negligent for failure to make a non-meritorious motion. *See United States v. Johnson*, 707 F.2d 317, 323 (8th Cir. 1983).

### E.  No Certificate of Appealability is Warranted

A Certificate of Appealability may issue under 28 U.S.C.§ 2253 only if the applicant has made a substantial showing of the denial of a constitutional right. A "substantial showing" is one demonstrating that reasonable jurists could debate whether the petition should have been resolved in a different manner or the issues presented deserved further proceedings even though the petitioner did not prevail on the merits in the court considering his case at present. *See Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

Here, and for the reasons discussed above, the undersigned finds that there is no substantial showing of the denial of a constitutional right, and a Certificate of Appealability should be denied.

### III.  Conclusion

For the reasons and upon the authorities discussed above, Mr. Cornelison's claims are not supported by the record in this case. I recommend that Mr. Cornelison's Motion, filed under 28 U.S.C. § 2255, be **DISMISSED with PREJUDICE**. I further recommend that a request for a Certificate of Appealability be denied.

**The parties have fourteen (14) days from receipt of this Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely written objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of August, 2015.

/s/ *Mark E. Ford*

HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE